Jeffrey J. Hepworth, ISB No. 3455
J. Grady Hepworth, ISB No. 10364
HEPWORTH LAW OFFICES
2229 W. State Street
P.O. Box 2815
Boise, ID 83701-2815
Telephone: (208) 333-0702
Facsimile: (208) 246-8655
courtservice@idalawyer.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SIERRNA BERG, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BOISE POLICE DEPARTMENT, a governmental entity, CITY OF BOISE, a political subdivision,<br><br>Defendant. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## I. INTRODUCTION

COMES NOW, Plaintiff Sierrna Berg ("Berg"), by and through her attorneys of record, Hepworth Law Offices, for causes of action against Defendants City of Boise Police Department and City of Boise for discrimination, retaliation, and wrongful termination of Berg under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, e-3 *et seq.* ("Title VII"), the Idaho Human Rights Act, I.C. § 67-5901, *et seq*. ("IHRA"), and the Idaho Protection of Public Employees Act, I.C. § 6-2101 *et seq*. ("IPPEA"). Berg requests judgment and money damages for her lost wages, lost employee benefits,

emotional distress and pain and suffering, litigation costs, reasonable attorney's fees, and all other damages and/or equitable relief available as a matter of right.

## II. PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Sierrna Berg is currently and at all material times was a resident of the City of Boise, County of Ada, State of Idaho. Ms. Berg was at all material times employed by the Defendants City of Boise by and through the City of Boise Police Department.

2. Defendant City of Boise Police Department is a governmental entity formed in the City of Boise, County of Ada, State of Idaho, that is responsible and liable for the wrongful actions of its officers, agents, and employees acting under their authority and apparent authority.

3. City of Boise is a municipality and/or political subdivision established in the County of Ada, State of Idaho, and is also responsible and liable for the wrongful actions of its officers, agents, employees, and other individuals acting under its authority or apparent authority.

4. Defendants City of Boise Police Department and City of Boise will be referred to jointly as "Defendants" where Plaintiff alleges both entities acted in concert, or may otherwise be jointly and separately liable for the conduct and/or omissions alleged herein.

5. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331. Plaintiff asserts federal subject matter jurisdiction pursuant to 42 U.S.C. § 2000e-2, e-3 *et seq*. for discrimination and retaliation on the basis of sex and/or gender.

6. This Court has supplemental jurisdiction of the state law claims and tortious causes of action asserted herein pursuant to 23 U.S.C. § 1367. The factual basis of the state law claims brought under the Idaho Human Rights Act and Idaho Protection of Public Employees Act are identical and/or inseparable from the operative facts underlying the federal claims.

7. Venue is proper pursuant to 28 U.S.C. § 1391, as all Defendants reside in the State of Idaho, and all acts and/or omissions occurred within the judicial district of the United States District Court for the District of Idaho.

8. Berg timely filed a complaint with the Idaho Human Rights Commission and the EEOC regarding the alleged sex discrimination and retaliation she endured in violation of Title VII and the IHRA. Berg received her Notice of Right to Sue on March 26, 2020, and thereby has exhausted and completed all administrative remedies.

9. Berg timely filed and served a Notice of Tort Claim upon Defendants on or about November 27, 2019. More than ninety days has elapsed, and Berg has thereby complied with the notice requirements under the Idaho Tort Claim Act, Title 6, Chapter 9, Idaho Code.

## III. GENERAL ALLEGATIONS

10. Sierrna Berg is a twenty-six-year-old female residing in Boise, Idaho. Berg's life-long dream was to serve as a law enforcement officer. Berg was hired by Defendants in January 2019 as a police officer in training for the City of Boise Police Department ("BPD").

11. Berg participated in BPD's in-house 20-week training academy to obtain her basic POST certification.

12. During BPD's POST academy training, Berg was elected by her peers in the training program to serve as class president.

13. In approximately March 2019, Berg witnessed an illegal battery that was committed by one of their training officers, Ofc. Josh Kincaid, against a fellow trainee. During the incident, a disagreement was believed to have arisen between Officer Kincaid and the trainee. The incident

resulted in Officer Kincaid applying an unprovoked lateral vascular neck restraint ("LVNR" or "choke hold") upon the trainee.

14. Berg, as a witness and the class president, filed a complaint against Officer Kincaid regarding his unprovoked battery of the trainee and violation of laws, rules, and regulations. At a minimum, Berg reasonably suspected Kincaid's unprovoked use of force upon an academy trainee was a violation of IDAPA 11.11.01.091.04 ( Law Enforcement Code of Conduct and Ethics), Idaho's Law Enforcement Instructor Code of Ethics, as well as the City of Boise Police Department Policy and Procedures Manual, section P-1.001 (Criteria for Use of Force.) Berg and her classmates were also bound by City of Boise Police Department Policy and Procedures Manual section P-1.001, to report the use of an LVNR to a supervisor.

15. Pursuant to pertinent rules and regulations, Berg (along with former class president Jeff Triplett) reported Kincaid's illegal conduct and use of force to her supervisor, BPD Training Officer Nate Davis. Berg timely reported Kincaid's violation of law, rule and/or regulation in a timely manner, which was reasonably intended to provide Defendants with an opportunity to correct the violation and engage in further inquiry and investigation. Berg thereby engaged in a "protected activity" under I.C. § 6-2104(1).

16. However, upon information and belief, Mr. Davis did not follow BPD rules and procedure, and failed to report the incident to Internal Affairs. Berg's entire POST class was disciplined for the incident, including being assigned push-ups.

17. Defendants, by and through their agents and officers, thereafter engaged in a pattern of sexist discrimination and retaliation against Berg. Malicious rumors intended to disparage, defame, marginalize, and discredit Berg began to circulate, including that she was engaged in an extra-

marital affair with one of her classmates. The unfounded rumors were discriminatorily motivated against her sex as a female officer, as well as intended and motivated as illegal retaliation for her protected activity under the IPPEA.

18. Berg reported the sexist retaliation to Training Officer John Tucker, and asked for advice. Berg thereby engaged in a protected activity under Title VII and IHRA.

19. Notwithstanding the malicious rumors intended to defame and disparage her, Berg graduated with her POST certification on or about May 30, 2019, and was therefore eligible to serve as a full-time law enforcement officer. Berg thereafter commenced BPD's Field Training Officer ("FTO") training program. For purposes of the FTO program, Defendants have enacted and adopted the Standardized Performance Guidelines ("SPGs"), which are intended to provide objective standards of performance and evaluation through the FTO program. Once Berg completed the FTO program, she would automatically be eligible for a pay raise, and would thereafter be eligible for future raises and promotions over the course of her career.

20. During Phase I of the FTO Program, Berg was assigned to Officer Kolos for in-the-field training and supervision. On or about June 2, 2019, Officer Kolos confronted Berg about the sexist and retaliatory rumors that apparently continued to be spread about her personal life, including a rumor that she was having an extra-marital affair with Jeff Triplett. Berg defended herself and specifically informed him the malicious rumors were false. Officer Kolos responded "just advice, there's more fish in the sea". Berg understood Officer Kolos to infer that there were rumors she was also sleeping with other members of BPD.

21. On June 15, 2019, Berg had a meeting with Sergeant Sean Stace, who was the acting supervisor of BPD's FTO program. During the meeting Sergeant Stace condoned the malicious

rumors circulating about Berg, and suggested, without any basis, that Berg's alleged "issues at home" may be "distracting" her. Sergeant Stace encouraged Berg to drop out of the FTO program, but told her that he "can't guarantee you a spot back." Berg again defended her reputation and insisted the rumors were false and that she was fully focused on completing the FTO program and continuing to serve BPD.

22. On or about June 28, 2019, Sergeant Stace again requested a meeting with Berg. During the meeting, Sergeant Stace informed Berg that he was "prescribing" further FTO training before passing Berg from Phase I. Prescription would require additional time spent in FTO training, and would therefore delay the raise in pay associated with completion of the FTO program. Prescription also carried negative connotations that would reasonably affect her employment, such as the reputation of being a weak or non-proficient officer.

23. Sergeant Stace primarily relied on sexist and discriminatory reasons for the prescription, such as "Seems like you are very distracted with things going on at home, you need to get your house in order." Sergeant Stace also admonished Berg that she needed "to be open in the car with your personal life about life problems and work problems." None of the reasons stated by Sergeant Stace were related to the SPG guidelines, and instead appeared to be entirely based upon Sergeant Stace's sexist animus towards her, and was intended as retaliation for her participating in activities protected under Title VII, IHRA, and the IPPEA.

24. Following the meeting, Berg texted Officer Kolos to inquire more specifically why she was being prescribed, and to inquire how she can improve her performance. Officer Kolos simply replied that they would talk more in person.

25. That same day, Sergeant Stace publicly confronted Berg in the BPD office and began yelling at her, stating that her text to Kolos was disrespectful and that she should never text an FTO officer on his day off. Sergeant Stace stated that if she had concerns about the decision to prescribe her, that any questions about the decisions would be considered "insubordination." Sergeant Stace's conduct was clearly intended to dissuade Berg from further opposing the discriminatory retaliation and harassment. Berg suspected that Sergeant Stace was acting out of loyalty to Officer Kincaid, or somehow held personal animus for her reporting Kincaid's conduct.

26. Berg ultimately passed her Phase I training. However, as Berg continued through the FTO program, she continued to be harassed by Sergeant Stace. Sergeant Stace enforced discriminatory and sexist standards, such as criticizing the pitch of Berg's voice and ordering her to "lower your voice." Sergeant Stace criticized Berg's decision to wear bracelets, despite the fact they were within BPD's dress code and policy. Sergeant Stace's comments were objectively sexist and discriminatory.

27. Sergeant Stace began carefully scrutinizing Berg's FTO training to a much stronger degree than Berg's male counterparts, including personally monitoring her radio calls. Sergeant Stace instructed Berg that if she did not pass her prescription, she would be terminated. Sergeant Stace's comment was a threat, and was intended to harass and increase the pressure already being placed upon her through the FTO program.

28. BPD further harassed Berg by manipulating her schedule to ensure she suffered extreme sleep deprivation. On more than one occasion, BPD scheduled Berg for alternating nighttime and morning shifts. Most trainees were typically scheduled to work the "swing" mid-morning shifts after a night shift, to allow for additional rest. Berg was repeatedly scheduled for back-to-back shifts that left little time for rest and recovery.

29. Upon information and belief, Defendants instructed Berg's FTO officers to fabricate reasons to mark her down or fail her during the FTO program. Berg began to receive discipline for pretextual reasons, such as saying "please" or using the words "sir" and "ma'am."

30. On September 23, 2019, Berg was again confronted by Sergeant Stace regarding a traffic stop she completed the week prior. Sergeant Stace was condescending and dismissive of Berg, and accused her again of pretextual poor performance during the traffic stop. Following the confrontation, Berg's FTO supervisor, Officer Sontag, informed Berg that she essentially needed to obtain "perfect" scores in order to pass FTO. Pursuant to BPD's SPG guidelines, "perfect" scores are not needed in order to graduate from the program.

31. BPD's harassment and retaliation caused Berg to suffer severe emotional distress, which physically manifested in exhaustion, weight loss, and depression.

32. On September 26, 2019, Berg filed a complaint with Captain Brian Lee and Investigator Regina Fredericks regarding the discriminatory and retaliatory conduct she had endured during the FTO program. Berg reasonably perceived the pervasive and severe harassment as creating a hostile work environment. Captain Lee advised that they had already heard about the rumors and were investigating the issues. Investigator Fredericks specifically apologized for the hostile work environment Berg had endured, and promised to look into the matter.

33. Two days later on September 28, 2019, Berg was pulled out of a briefing meeting to meet with Sergeant Stace and Sergeant Hilliard. During the meeting, Sergeant Stace and Sergeant Hilliard informed Berg that she appeared to be failing the FTO program, and that her FTO evaluation scores were insufficient. The close temporal proximity to her meeting with Captain Lee suggests the meeting was motivated by retaliation for her protected activities.

34. During the meeting, Sergeant Stace pulled up FTO evaluation scores (which had not been signed by Berg), which appeared to depict non-proficient performance. Upon review, Berg recognized that the scores appeared to be fabricated, and were inconsistent with the body camera footage that is maintained during the FTO program. Berg objected to the false and fabricated scores and urged Stace and Hilliard to review her body camera footage. Sergeant Stace and Hilliard ignored her complaints, and ordered a fourth FTO prescription. Berg was informed that if she did not pass this final prescription, she would be fired.

35. Berg reasonably became emotional during the meeting and began to tear up. Sergeant Stace and Hilliard continued to berate and humiliate her. They made comments that based on Berg's "emotional state" that she was not fit to be a law enforcement officer. Berg reasonably requested if she could have a day off to collect herself. Sergeant Stace continued to belittle her for the request and demanded that Berg resume the FTO program immediately.

36. Berg requested another meeting with Captain Lee. Prior to the meeting, Berg reviewed her body camera footage regarding the evaluation scores Berg suspected had been falsified. However, when Berg attempted to review the DTR evaluation sheet, to her dismay, the evaluation had been placed in "edit" mode, so she could no longer access the contents.

37. Berg reiterated the confrontation she had with Sergeant Stace to Captain Lee. During the meeting, she further requested that she be transferred to a different FTO Sergeant. Captain Lee granted her request and transferred her remaining prescription under Sergeant Smith. Captain Lee also granted her one week of administrative leave from approximately September 29 until October 5, 2019.

38. Berg completed her remaining FTO trainings under Officer Cook and Officer Michelle Tiner. Berg was approved to commence End Phase (EO), which was the final phase of BPD's FTO program. However, Berg was assigned to Officer Kolos to complete the final phase, despite Officer Kolos' previous disparaging comments about her personal life that had been used to justify Berg's original FTO prescription.

39. Despite Berg's concerns about Kolos, the first few days of EO went smoothly, and Berg believed Kolos generally approved of her performance.

40. In early November 2019, a Notice of Tort Claim was served upon BPD by a classmate that had also witnessed Kincaid apply the LVNR. The Notice of Tort Claim alleged violations of the IPPEA and wrongful termination, and specifically listed Sierrna Berg as a witness.

41. Shortly after, Berg was made aware of rumors circulating among the FTO officers that because she had agreed to give information in the court proceeding related to her classmate, that she too was contemplating suing BPD for retaliation arising from the Kincaid incident.

42. Shortly after, Berg witnessed Sergeant Stace pull Officer Kolos aside for a long conversation. Berg was in the nearby vicinity and could hear her name mentioned several times.

43. Kolos's demeanor towards Berg changed dramatically, and he too began harassing her and creating pretextual reasons to criticize and disparage her. Upon information and belief, Kolos later told a colleague, "Sierrna is a nice girl, but I will do whatever it takes to get rid of her."

44. Berg again reported the discrimination and retaliation to Investigator Fredericks. Berg requested that she be transferred to another FTO for her final three EO trainings. Rather than transfer Berg to another officer, Captain Matt Jones placed Berg on administrative leave.

45. On or about November 18, 2019, Berg attended a meeting with Captain Matt Jones, a Lieutenant Berg had never met before, and a representative from the City of Boise legal department. During the meeting Captain Jones inquired into why Berg perceived the work environment with Officer Kolos as "hostile." Berg reiterated her concerns about Sergeant Stace's lengthy conversation with Kolos, and as well as Kolos's comment about "doing whatever it takes" to get rid of Berg. Berg also reported general unprofessional behavior, including the fact Kolos would constantly roll his eyes at her and mark Berg down for things that were not true, accurate, and objectively inconsistent with the SPGs.

46. Captain Jones responded dismissively, and then informed Berg that he was going to order yet another prescription of FTO before allowing Berg to complete her remaining EO. Berg asked why she was being prescribed when she had been receiving adequate scores. Berg objected to being prescribed again and insisted the conduct was retaliatory because there was no objective basis to suggest she needed additional training after she had already completed an abnormally protracted FTO program.

47. Capt. Jones promptly asked Berg to step out of the room and called in Captain Brian Lee, Acting-Chief Ron Weinager, and Captain Burch. When Berg was invited back into the room, she was informed that she was being terminated immediately, and would need to arrange to return her gear and equipment by the next day.

## IV. <u>CAUSES OF ACTION</u>

### A. Count One: Discrimination and Retaliation on the Basis of Sex in Violation of Title VII of The Civil Rights Act, 42 U.S.C. § 2000e-2, e-3 *et seq.*

48. Plaintiff realleges and incorporates by reference all paragraphs set forth above.

49. Title VII, 42 U.S.C. § 2000e-2 prohibits employment practices that discriminate against persons on the basis of their sex and/or gender.

50. The Boise Police Department is a predominately male workplace, and Berg was among a minority of female officers employed. Berg was therefore a protected class under Title VII.

51. Plaintiff Sierrna Berg was subjected to verbal harassment and adverse employment actions on the basis of her sex. Defendants subjected Berg to a campaign of harassment and defamation by accusing Berg of negative sexist stereotypes, including but not limited to sexual promiscuity. Berg was further subjected to discipline and adverse action as a result of other sex-specific characteristics, such as the natural pitch of her voice, and her choice of personal dress (such as bracelets).

52. The campaign of harassment and defamation against Berg was so severe and pervasive that reasonable persons in Berg's circumstances would find their work environment to be hostile and abusive. The campaign of harassment and abuse materially and negatively altered the terms of Berg's employment with Defendants.

53. Management level agents and employees of Defendants knew or should have known about the abusive harassment. Berg reasonably and in good faith communicated the existence of the discrimination and hostile work environment to her superiors and supervisors on numerous occasions.

54. Defendants did not exercise reasonable care to promptly correct the harassing behavior, and willfully and/or recklessly placed Berg in situations that were foreseeably likely to subject her to further discrimination, retaliation, abuse, and general emotional distress.

55. Title VII of the Civil Rights Act further prohibits employers from discriminating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

56. Berg repeatedly opposed and reported practices which she reasonably suspected were violations under Title VII, including the campaign of harassment and abuse she was subjected to as a result of her sex and/or gender.

57. Defendants retaliated against Berg by considering her opposition and complaints to Defendants' unlawful conduct as "insubordination," and effectively discouraged Berg from further reporting and opposing unlawful employment practices.

58. Defendants' retaliatory actions were sufficient to deter a reasonable person from engaging in protected activities under Title VII.

59. Defendants took materially adverse actions against Berg, including but not limited to issuing disciplinary warnings, threats of termination or discipline, reprimands by supervisors, deferment of raises and promotions, and ultimately termination.

60. Defendants' discrimination and retaliation was substantial and severe, and foreseeably resulted in Berg suffering extreme emotional distress. Berg's emotional distress physically manifested in exhaustion, sleeplessness, weight loss, and fatigue.

61. As a direct, legal and proximate result of Defendants' retaliation, Berg sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

62. Plaintiff is entitled to her reasonable attorneys' fees, expert fees, and costs of suit.

### B. Count Two: Discrimination and Retaliation in Violation of the Idaho Human Rights Act, Idaho Code Section 67-5901, *et seq.*

63. Plaintiff realleges and incorporates by reference all paragraphs set forth above.

64. The Idaho Human Rights Act prohibits employers from discrimination because of sex.

65. The IHRA also prohibits discrimination or retaliation against any individual because he or she has opposed any practice made unlawful by this chapter, or because such individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation.

66. For the reasons more specifically set forth in Subsection A, *supra*, Berg was subjected to adverse action because of her sex as a minority female officer.

67. Berg further suffered adverse action as retaliation for reporting and/or opposing conduct made unlawful under the IHRA.

68. Defendants' discrimination and retaliation was substantial and severe, and foreseeably resulted in Berg suffering extreme emotional distress. Berg's emotional distress physically manifested in exhaustion, sleeplessness, weight loss, and fatigue.

69. As a direct, legal and proximate result of Defendants' retaliation, Berg sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

70. Plaintiff is entitled to her reasonable attorneys' fees, expert fees, and costs of suit.

### C. Count Three: Retaliation in Violation of the Idaho Protection of Public Employee Act, Idaho Code Section 6-2101 *et seq.*

71. Plaintiff realleges and incorporates by reference all paragraphs set forth above.

72. Berg engaged in activities protected under Idaho Code section 6-2104(1) when she reported the actual and/or suspected violation of law, rule, and/or regulation arising from Officer Kincaid's unprovoked use of force and unreasonable application of a LVNR against a BPD trainee.

73. Berg reasonably suspected Kincaid's unprovoked use of force upon a BPD trainee was a violation of IDAPA 11.11.01.091.04 (Law Enforcement Code of Conduct and Ethics), Idaho's Law Enforcement Instructor Code of Ethics, as the City of Boise Police Department Policy and Procedures Manual, section P-1.001 (Criteria for Use of Force), and common law assault and battery.

74. Berg timely reported the suspected violation of law, rule, or regulation to her supervisor.

75. Berg engaged in activities protected under Idaho Code section 6-2104(2) when she participated and gave information in good faith regarding the investigation, hearings, and/or court proceeding related to her classmate's Notice of Tort Claim and anticipated lawsuit for Defendants' alleged violations of the IPPEA.

76. Berg further engaged in activities protected under Idaho Code section 6-2104(1), (2) when she reported, opposed, and participated in investigation into alleged fabrication and fraudulent alteration of documents pertaining to her own FTO training, as well as documents and records pertaining to her classmate's FTO training.

77. Defendants violated Idaho Code Section 6-2104(4) by implementing rules and/or policies that unreasonably restricted Berg's ability to document the existence of violations, or suspected violation of laws, rules or regulations. BPD unreasonably restricted Berg's ability to document violations by editing and/or restricting access to training evaluations and body camera footage, altering or destroying training records, construing her opposition to suspected discrimination and

retaliation as "insubordination," and otherwise arbitrarily interpreting the SPG guidelines in an unreasonable and retaliatory manner.

78. Defendants illegally took adverse action against Berg in the form of a defamatory campaign of rumors that materially and substantially affected her employment, threats of discrimination, application of pretextual discipline, deferment of raises and promotions, and ultimately termination.

79. Defendants' retaliation and adverse actions were pervasive and severe, and foreseeably resulted in Berg suffering extreme emotional distress. Berg's emotional distress physically manifested in exhaustion, sleeplessness, weight loss, and fatigue.

80. As a direct, legal and proximate result of Defendants' retaliation, Berg sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

81. Plaintiff is entitled to her reasonable attorneys' fees, expert fees, and costs of suit.

## V. ATTORNEY'S FEES

82. As a result of the wrongful conduct of Defendants, as alleged above, Sierrna Berg has been forced to hire legal counsel to prosecute this action. Pursuant to I.C. 12–120(3), 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 1988, Idaho Code Section 6-2105(1), and Fed. R. Civ. P. 54(d)–(e), Berg is entitled to a reasonable award of costs and attorney's fees. A reasonable attorney's fee rate is $400.00 per hour for Jeffrey J. Hepworth and $175.00 per hour for J. Grady Hepworth, and the contractual time and expenses incurred by Filicetti Law Office, at not less than $350.00 per hour.

## VI. DEMAND FOR TRIAL BY JURY

83. Plaintiff demands trial by jury pursuant to the Seventh Amendment of the United States Constitution, Idaho Const. Art. I, Sec. 7, and Fed. R. Civ. P. Rule 38 for all claims alleged herein.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sierrna Berg requests judgment against Defendants as follows:

a) For past and future lost wages and employment benefits in an amount to be proven at trial by jury in an amount exceeding $500,000.00;

b) For compensatory and consequential damages, including past and future medical expenses, to be determined at trial;

c) For noneconomic damages, including pain, suffering, and emotional distress in an amount to be proven at trial;

d) For reinstatement to a full-time position at a rate of pay not less than her previous hourly rate, plus benefits, job protection, and all applicable raises and promotions (past and future);

e) For an award of interest (both pre- and post-judgment) at the highest lawful rate pursuant to 28 U.S.C. § 1961, I.C. § 28-22-104, and relevant state and federal law;

f) For an award of court costs, including expert witness fees as appropriate, and attorney's fees in an amount to be determined at a rate of $400.00 per hour.

g) For such other legal and/or equitable relief as this Court deems just and appropriate.

*PLAINTIFF DEMANDS TRIAL BY JURY*

DATED this 2nd day of April, 2020.

HEPWORTH LAW OFFICES

By__/s/_*J. Grady Hepworth*__________
Jeffrey J. Hepworth
J. Grady Hepworth
*Attorneys for Plaintiff*

**COMPLAINT AND DEMAND FOR JURY TRIAL**
- 18